**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STOPS Enterprises, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 12 CV 7763 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| United Medical Equipment Co., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Plaintiff STOPS Enterprises, LLC's motion for summary judgment [33]. For the reasons set forth below, the Court grants in part STOPS Enterprises' motion [33] as to Counts I and II and denies as moot the motion as to Counts III and IV. STOPS's motion to conduct expedited discovery into Defendant's current financial condition [56] is stricken as moot.

**I.      Background**

**A.      Procedural History**

On September 27, 2012, Plaintiff STOPS Enterprises, LLC ("STOPS") filed a four-count complaint alleging breach of contract (Count I), an action for account stated (Count II), quantum meruit (Count III), and breach of implied contract (Count IV).[1] The parties' joint status report, filed on December 5, 2012, specified a discovery closure date of March 29, 2013. The March 29, 2013 deadline for completing non-expert discovery passed without Defendant United Medical Equipment Co. ("UME") making any requests for any depositions. Further, UME failed to respond to STOPS's discovery requests in a timely fashion, and then failed to answer

---

[1] Counts III and IV are plead in the alternative.

discovery by a March 6, 2013 extension agreed to by the parties during a Local Rule 37.2 conference. As a result, STOPS filed a motion to compel, which was granted, and the Court ordered UME to answer written discovery by March 15, 2013.

UME eventually answered written discovery; however, its responses were deficient, and the Court ordered outstanding discovery to be completed by June 12, 2013. UME again failed to comply with the deadline, and the Court again extended the discovery deadline and ordered discovery completed by June 28, 2013. The Court then ordered all supplemental discovery disclosures on or before August 16, 2013. After discovery was complete, STOPS timely filed its motion for summary judgment on September 13, 2013. UME's response to STOPS's summary judgment motion initially was due on October 11, 2013. UME filed a motion to extend that deadline by 28 days. The Court granted UME's requested extension, but UME disregarded this Court's November 8, 2013 filing deadline. UME failed to contact either the Court or STOPS about extending this deadline, and simply ignored it. Plaintiff then filed a motion for an order granting its unopposed motion for summary judgment.

At the hearing on Plaintiff's motion, UME orally requested another extension of time to respond to STOPS's summary judgment motion, which the Court granted. The Court ordered UME to respond to the summary judgment motion by December 17, 2013. On December 17, 2013, UME filed its response to the summary judgment motion, as well as a motion requesting additional discovery as to its affirmative defense that STOPS failed to charge the proper rate. UME first raised its argument that STOPS failed to charge the proper rate in its answer and affirmative defenses that were filed in November 2012. The Court denied UME's motion requesting additional discovery, concluding that UME's lack of diligence in pursuing discovery could not serve as a basis for allowing discovery in circumstances such as this. *Kalis v. Colgate–*

*Palmolive Co.*, 231 F.3d 1049, 1057 n. 5 (7th Cir. 2000) ("When a party fails to secure discoverable evidence due to his own lack of diligence, it is not an abuse of discretion for the trial court to refuse to grant a continuance to obtain such information.") (citing *Pfeil v. Rogers*, 757 F.2d 850, 857 (7th Cir. 1985)); see also *Procter & Gamble Co. v. McNeil-PPC, Inc.*, 615 F. Supp. 2d 832, 840-41 (W.D. Wis. 2009) (non-moving party was not entitled to further opportunity to engage in discovery because that party failed to timely file a motion asking that the court compel discovery).

### B. Fact Statements

Local Rule of Civil Procedure 56.1 requires a party moving for summary judgment to file "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." N.D. Ill. R. 56.1(a)(3). The statement "shall consist of short numbered paragraphs" that refer to "materials relied upon to support the facts set forth." N.D. Ill. R. 56.1(a). The party opposing summary judgment is then required to file "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." N.D. Ill. R. 56.1(b)(3)(B).

Here, the relevant facts are taken from STOPS's Local Rule 56.1 Statement of Material Facts. Despite having the opportunity, UME—which is represented by counsel—failed to submit a statement of additional facts, but did submit a Local Rule 56.1(b)(3) Response to Plaintiff's Statement of Material Facts. In assessing Plaintiff's fact statements, the Court will consider UME's responses to the extent that UME properly cites to record evidence and does not merely assert legal conclusions.

### C. Factual History

STOPS procures and provides transportation services, as well as other services, for injured workers. UME provides products and services, including medical equipment rental, for patients, workers' compensation and auto insurers, and third party administrators.[2] STOPS and UME entered into an agreemen in which STOPS agreed to provide transportation services to UME and its customers in exchange for compensation from UME. STOPS and UME maintained a business relationship for over three years, from approximately December 2008 to March 2012.

For more than two years, UME regularly paid its invoices; however, UME began to fall behind on payments, and by March 2011, UME owed $114,000 to STOPS. For approximately one year, from March 2011 to March 2012, STOPS and UME representative Shawn Landa corresponded regarding payments owed to STOPS by UME; and in these communications UME continually promised payment to STOPS, acknowledged the balance due, and did not dispute any rates or charges. In March 2012, STOPS terminated the business relationship due to UME's failure to pay outstanding invoices.

During discovery in this lawsuit, UME produced the invoices that it received from STOPS, segregating the invoices as either "paid" or "unpaid." STOPS provided transportation services at the request of UME, as reflected by the invoices produced by UME. UME produced 648 paid invoices, ranging from December 22, 2008, to January 4, 2011, totaling $100,037.69. Many of the 648 paid invoices produced by UME included "wait time" charges.[3] UME produced 948 unpaid invoices, ranging from January 4, 2011, to May 4, 2012, totaling

---

[2] STOPS is a Delaware corporation with its principal place of business in Titusville, Florida. UME was incorporated in Illinois and has its principal place of business in Illinois. This Court has diversity jurisdiction over this matter pursuant to the provisions of 28 U.S.C. § 1332 given that the parties are diverse in citizenship and the amount in controversy exceeds $75,000 exclusive of interest and costs.

[3] The parties agree that "wait time," for purposes of this litigation, is the time that a STOPS driver is required to wait for a patient in connection with medical-related patient transportation services requested by UME.

$185,811.88.

The evidence of record reflects that, with respect to all of the unpaid invoices, STOPS applied a discount to the usual and customary rates when invoicing UME. UME concedes that the parties initially agreed upon a 15% discount, which was later increased to an 18% discount, and the evidence of record confirms that STOPS initially applied a 15% discount, and increased the discount to 18% as agreed by the parties. STOPS periodically adjusted its usual and customary rates as reflected by its transportation pricing lists for the period applicable to the disputed invoices. When STOPS adjusted its usual and customary rates, it also adjusted its discounted rates. From January 2011 to March 2012, STOPS always applied an 18% discount to the prevailing usual and customary rates when invoicing UME. Over the course of the business relationship, STOPS charged UME at a lower rate than most of STOPS's other clients, the majority of whom received either a 5% or 10% discount from the usual and customary rates.

In order to authorize patient transportation, a UME representative would either call or e-mail STOPS, and the communications were documented in a patient-specific project authorization log. During discovery, UME produced appointment confirmation e-mails between UME employee Amy Kryski and various STOPS employees. When an appointment was made by UME, a STOPS employee would send an appointment confirmation e-mail to UME, which included patient name, transport locations, transport dates, and wait time authorization (either "yes" or "no"). The evidence of record reflects that, of the $185,811.88 in total unpaid invoices produced by UME, $27,918.29 of the charges are wait time charges, and $157,893.59 of the unpaid invoice charges are not wait time charges. Of the $27,918.29 in wait time charges, $14,122.23 of the wait time charges were actually authorized by UME representatives, as reflected by the patient-specific project authorization logs and the appointment confirmation

emails exchanged by the parties.  The remaining $13,796.06 in wait time charges do not reflect express authorization, but UME has not presented evidence that it ever objected to the wait time reflected in these invoices.

From March 4, 2011, to March 16, 2012, STOPS employees corresponded via e-mail with UME representative Shawn Landa regarding payments owed to STOPS from UME.  On March 4, 2011, STOPS accounts receivable supervisor Sigi Nagys e-mailed Shawn Landa to notify him that UME owed STOPS a balance of $114,000, with $88,000 over 60 days old, and asking UME to get the balance under $100,000 by the end of March.  Landa did not object to the balance owed, and in response to the request about receiving the balance owed by the end of March, Landa responded "think so."  On July 15, 2011, Nagys e-mailed Landa to notify him that UME had not made payments to STOPS in several weeks and that UME's accounts receivable balance was up to $112,000 and requested payment of $20,000 by the end of the month.  Landa replied "OK" and did not raise any objection to the amount owed or STOPS's invoices.

On July 26-28, 2011, Nagys and Landa again corresponded via e-mail regarding the payments owed to STOPS; Landa never objected to STOPS's invoices or the amount owed and indicated that "I will try to get some money out to you," "I'm working on it," and "I'll get you something out."  In response to Nagys' e-mail confirming the payment made on July 27, 2011, Landa indicated that "I'll work with payables to come up with a plan to get you folks paid off. I've been doing that one by one with all our vendors. We're not in the business of stiffing anyone."  During the e-mail exchange between Nagys and Landa on July 15-28, 2011, Landa did not dispute the rates charged by STOPS, any fees charged by STOPS (including wait time), or the amount owed to STOPS by UME.

On December 7-9, 2011, Nagys and Landa exchanged e-mails regarding payment owed

by UME to STOPS; during the e-mail exchange, Landa indicated that UME had sent $5,000 and would "send more [M]onday." Landa did not dispute the rates charged by STOPS, any fees charged by STOPS (including wait time), or the amount owed to STOPS by UME.

On February 10, 2012, Nagys e-mailed Landa, noting that STOPS was "anxious to get this moving since the balance owed by UME continues to increase." Nagys' February 10, 2012, e-mail included an attachment, which reflected that the balance owed by UME was then $169,193.20, and which included a proposed payment agreement. At that time, UME did not raise any objection to the total balance owed to STOPS. On February 27, 2012, Nagys e-mailed Landa again, inquiring about the proposed payment agreement. Landa replied that UME had sent payment of $5,000 last week, was still discussing the agreement, and would like to have the agreement executed sooner or later. During the February 2012 e-mail exchanges between Nagys and Landa, Landa did not dispute the rates charged by STOPS, any fees charged by STOPS (including wait time), or the amount owed to STOPS by UME.

On March 6, 2012, Nagys and Landa again exchanged e-mails about the outstanding debt. Landa indicated that UME would be sending more payments and did not dispute the rates charged by STOPS, any fees charged by STOPS (including wait time), or the amount owed to STOPS by UME. On March 16, 2012, Nagys e-mailed Landa indicating that STOPS would be canceling all pending open orders placed by UME; in reply, Landa indicated that UME had "every intention" of paying STOPS. At this time, Landa did not dispute the rates charged by STOPS, any fees charged by STOPS (including wait time), or the amount owed to STOPS by UME.

From March 4, 2011 to March 16, 2012, UME representatives continued to place new orders for patient transportation with STOPS. UME periodically submitted partial payment to

STOPS on the total balance due as reflected by payments dated March 24, 2011, to March 8, 2012. During the time that UME was submitting partial payments, from March 24, 2011, to March 8, 2012, UME representatives did not dispute or allude to a dispute regarding the rates charged by STOPS, any fees charged by STOPS (including wait time), or the total amount owed to STOPS by UME. On March 15, 2012, STOPS terminated the business relationship with UME, and UME ceased making payments on the total balance due to STOPS.

In its answer to STOPS's complaint, UME admitted that the parties entered into an oral agreement for STOPS to provide transportation services, that STOPS provided the services, and that it has not paid the full amount as claimed on STOPS's invoices. UME further admitted that it "promised at certain times to pay some amount of money to STOPS" and that "STOPS is entitled to payment for services rendered per the agreement between the parties." In its responses to STOPS's requests for admission, UME also admitted that it never provided STOPS with written instruction to change the rates that STOPS was charging on its invoices nor advised STOPS that it had failed to apply to an invoice any discount agreed to by the parties.

Throughout the parties' business relationship, there were occasions when UME raised objections to rates or unapproved wait time with regard to invoices that are not at issue in this litigation. STOPS corrected the errors in rates and wait time with respect to these disputes. However, prior to this litigation, UME never raised any objections with regard to the unpaid invoices at issue in this lawsuit. After this lawsuit was filed, UME raised a question about the amount owed to STOPS and asserted in its answers to interrogatories that: (1) the rates charged to UME did not comport with the agreement between the parties; and (2) all wait time charges did not comport with the agreement between the parties. In its answers to interrogatories, UME asserted that STOPS invoiced UME at an increased rate from "the initially agreed upon 15% off

STOPS' listed usual and customary billing." UME further contends that "STOPS did not apply the proper discount to the usual and customary rates when invoicing UME in breach of the Lowest Price Guaranty."

## II.    Legal Standard on Summary Judgment

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

### III.    Analysis

No one disputes that, pursuant to an oral agreement, STOPS provided transportation services to injured workers on behalf of UME, and that UME received the services and accepted the invoices for those services without objection, yet failed to pay an amount owed to STOPS. UME admits that an oral agreement existed between the parties, concedes that STOPS performed the work reflected in the unpaid invoices, acknowledges that STOPS submitted the unpaid invoices to UME, and agrees that it failed to pay the unpaid invoices. Once STOPS filed the instant lawsuit, however, UME raised—for the first time—two complaints which supposedly entitled UME to a reduction of the total debt owed to STOPS.  A review of the evidence of record reveals that UME's defenses are without merit.

#### A.    Breach of Contract

To establish a claim for breach of contract, a plaintiff must show: (1) an agreement existed between it and the defendant; (2) the plaintiff substantially performed its obligation under the agreement; (3) the defendant breached the agreement; and (4) the plaintiff was damaged by the breach.  *Klem v. Mann*, 665 N.E.2d 514, 518 (Ill. App. Ct. 1st Dist. 1996).  Under Illinois law, courts may consider the course of dealings between the parties when determining the terms of an oral contract.  *H&H Press, Inc. v. Axelrod*, 638 N.E.2d 333, 338-39 (Ill. App. Ct. 1st Dist. 1994); see also *Capitol Converting Equipment, Inc. v. LEP Transport, Inc*., 965 F.2d 391, 396 (7th Cir. 1992) (course of dealing established that liability limitation contained on transportation company's invoice was part of agreement); *Mulliken v. Lewis*, 615 N.E.2d 25, 28-29 (Ill. App. Ct. 4th Dist. 1993) (a prior course of dealing between the parties may be considered in determining the terms of an oral contract); *Wald v. Chicago Shippers Association,* 529 N.E.2d 1138, 1147 (Ill. App. Ct. 1st Dist. 1988) (a previous course of dealing may give meaning to or

qualify an agreement).

Here, the undisputed facts demonstrate that an oral agreement existed between STOPS and UME. UME further admits that STOPS is entitled to compensation, from UME, in exchange for the transportation services provided to UME; that STOPS submitted invoices to UME; and that, starting in approximately March 2011, UME stopped paying invoices submitted by STOPS, and its failure to pay these invoices continued for months. In other words, UME concedes that STOPS has performed the work reflected in the unpaid invoices and that it has not paid STOPS for this work. The only real issue is the amount owed by UME.

UME has accrued a debt totaling $185,811.88, an amount that is reflected in the invoices that were produced by UME in this litigation. During the business relationship, UME never objected to the rates charged or the wait time included in the unpaid invoices at issue in this lawsuit. Now, UME attempts to raise two "defenses" to STOPS's claims. First, UME contends that STOPS charged an excessive rate. Second, UME asserts that STOPS seeks to recover for wait time that was not approved.

### 1. Excessive rate

Faced with the evidence presented at summary judgment, UME admits that it owes STOPS for services rendered, but asserts that the amount owed must comply with a "lowest rate guarantee" allegedly given to UME by STOPS. Throughout this litigation, UME has taken the position that STOPS failed to apply an 18% discount to its usual and customary pricing. STOPS's summary judgment materials established that the agreed upon 18% discount was, in fact, applied to all of the invoices at issue in this case, and UME has failed to identify any evidence to contradict this critical point. Instead, UME now contends that STOPS failed to honor the ambiguously described "lowest rate guarantee."

In support of its "lowest rate guarantee" defense, UME provides what it purports to be an undated rate sheet from ProCare, a company that is not a party to this litigation and which has never been identified in discovery. UME contends, "based on information and belief," that ProCare was charging these rates in 2008. UME's attempt to create an issue of fact with a document that lacks a foundation as to the time it was created, and which was never produced in discovery, is unavailing. See *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 533 (7th Cir. 2003) (inadmissible evidence will not overcome a motion for summary judgment); *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 925 (7th Cir. 2001) (inadmissible hearsay is not enough to preclude summary judgment); *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996) (evidence relied upon at the summary judgment stage must be competent evidence of a type otherwise admissible at trial).

Additionally, a contract term that is uncertain or vague is unenforceable under Illinois law. *Academy Chicago Publishers v. Cheever*, 144 Ill. 2d 24, 29-30 (1991) (explaining that "if the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract."). The Seventh Circuit has rejected an argument almost identical to that raised by UME because terms such as "best price" or "lowest rate guarantee" are ambiguous and indefinite. See *Dynegy Marketing & Trade v. Multiut Corp.*, 648 F.3d 506 (7th Cir. 2011) (holding that alleged "best price" contract is too vague to constitute a legally enforceable contract term). Applying Illinois law, the Seventh Circuit explained that the term "best price" is too vague to be enforceable: "[v]ague statements about 'best' price do not an agreement make." *Id.* at 516; see also *Cissne v. CHS, Inc.*, 2007 WL 1747162 (E.D. Wash. June 15, 2007) ("[t]he undisputed evidence does not support an oral contract having terms that are determinable by reference to any defined standard. The 'best price' is hardly a term,

condition or price that is clear and straight-forward.").

Price is an essential term to an oral contact. Like "best price," the term "lowest rate guarantee" is vague and uncertain. Moreover, UME has not put forth any admissible evidence that demonstrates that STOPS did not meet its end of the bargain. Therefore, UME's "lowest rate guarantee" defense fails as a matter of law, and UME simply has no basis for disputing the $157,893.59 portion of the debt (which reflects all non-wait time charges) owed to Plaintiff.

## 2. *Wait time charges*

The unpaid invoices reflect that STOPS charged UME for wait time on numerous occasions, and the total amount of wait time charged by STOPS that remains unpaid is $27,918.29. A comparison of the unpaid invoices, the project authorization logs, and the appointment confirmations reflects that UME expressly authorized STOPS to incur $14,122.23 in wait time charges; the remaining balance of wait time charged to UME totals $13,796.06. In response, UME contends that none of the wait time was approved. As demonstrated below, UME's denial ignores the evidence of record.

First, UME ignores extensive evidence that UME in fact authorized $14,122.23 in wait time charges. For instance, appointment confirmation emails often included the following statement: "Wait Time Authorized: Yes." These appointment confirmation e-mails were all sent prior to the date of transportation and were delivered to Amy Kryski of UME. UME produced these appointment confirmation e-mails in the course of this litigation, which confirms that UME actually received these e-mails. Additionally, the record before the Court does not include a single objection by UME to the wait time charged from January 2011 to March 2012. Additionally, UME continued to place orders with STOPS for over a year after a significant balance accrued without offering any objection to the wait time charged by STOPS. The record

clearly shows that UME expressly authorized $14,122.23 in wait time charges.

The remaining balance of wait time charged to UME totals $13,796.06. There is no evidence in the record that the remaining balance was expressly authorized in the same manner as the $14,122.23 discussed above. However, as previously set forth, under Illinois law, the prior course of dealing between the parties may be considered in determining the terms of an oral contract. See *Capitol Converting Equipment,* 965 F.2d at 396; *Mulliken*, 615 N.E.2d at 28-29; *Wald,* 529 N.E.2d at 1147. STOPS contends that it is entitled to the balance of wait time charged to UME based on the parties' course of dealing during their business relationship.

In *H&H Press, Inc. v. Axelrod*, a printing company brought an action against the officers of a corporation for breach of an oral agreement. *H&H Press, Inc. v. Axelrod*, 638 N.E.2d at 338. There was no written agreement between the parties, but that they had done business together for about one year. *Id.* Plaintiffs presented evidence that the defendants rarely showed any concern for price; that the prices charged by plaintiffs were at or slightly below market price; that each invoice was delivered at the time the printing services were performed; and that at no time after delivery did defendants express any concern with price. *Id.* Plaintiffs also presented evidence that the procedure used in pricing the 10 disputed invoices was the same procedure used in pricing the previous 19 invoices which had been paid by defendants. *Id.* In finding for plaintiffs, the Illinois Appellate Court found that the plaintiffs and defendants had been engaged in a course of dealing whereby defendants requested that printing services be performed as soon as possible, without requiring price quotes before the work was done, and paid the invoices sent by plaintiffs when the work was completed. *Id.* at 338-39. The court concluded that the damages for the corporation's failure to pay for printing services should be assessed based on prices reflected in the invoices. *Id.*

Here, the evidence establishes that UME paid 648 invoices, from December 2008 until January 2011, totaling $100,037.69. Many of these invoices contained charges for wait time that UME did not expressly authorize. The fact that UME failed to object to the wait time charges, and in fact paid for wait time on numerous occasions, establishes a longstanding course of conduct that authorized STOPS to charge for wait time. Moreover, STOPS used the same procedure in pricing these 648 paid invoices as it used in pricing the 948 unpaid invoices that are the subject of this lawsuit. All invoices were delivered soon after the work was completed and the rates charged were below the usual and customary rates, as agreed by the parties. UME rarely showed any concern for price and did not dispute the amount owed to STOPS by UME. When it did, STOPS corrected any errors. Further, the record reflects that over the course of the e-mail communications between the parties ranging from March 2011 to March 2012, UME consistently assured STOPS that payment was forthcoming. During this time period, UME continued to place new orders for transportation services, without raising an issue regarding rates or wait time charges on the unpaid invoices, and made periodic partial payments to STOPS, without alluding to a dispute regarding the invoices.

The Court concludes that the course of conduct between the parties establishes that STOPS is entitled to summary judgment for all wait time charged on its invoices. In addition to the $157,893.59 previously discussed, UME is liable for $27,918.29 in wait time charges, for a total judgment of $185,811.88.

**B.    Account Stated**

Even if the Court concluded that an oral contract did not exist between STOPS and UME, STOPS would be entitled to summary judgment on its claim for an account stated. An "account stated" is a determination of the amount of an existing debt, and an action for an account stated is

founded upon a promise to pay that debt. *Patrick Engineering, Inc. v. City of Naperville*, 976 N.E.2d 318, 336 (2012). When a statement of account is rendered by one party to another and is retained by the latter beyond a reasonable time without objection, that statement constitutes an acknowledgment and recognition by the latter of the correctness of the account, together with a promise, express or implied, for the payment of such balance. *W.E. Erickson Construction, Inc. v. Congress-Kenilworth Corp.*, 477 N.E.2d 513, 520 (Ill. App. Ct. 1st Dist. 1985); *Motive Parts Co. of Am., Inc. v. Robinson*, 369 N.E.2d 119, 122 (Ill. App. Ct. 1st Dist. 1977). In this manner, the debtor and creditor have a meeting of the minds as to the accuracy of the account and have manifested their mutual assent to the agreement. *Toth v. Mansell*, 566 N.E.2d 730, 734-35 (Ill. App. Ct. 1st Dist. 1990). The manner of acquiescence is not critical, and the meeting of the minds may be inferred from the parties' conduct and the circumstances of the case. *Id.* An action for account stated is a valid alternate theory for proving the same damages asserted in a breach of contract claim. *Fabrica de Tejidos Imperial, S.A. v. Brandon Apparel Group, Inc.*, 218 F. Supp. 2d 974, 979 (N.D. Ill. 2002).[4]

During the e-mail communications between the parties, UME established an account stated on several occasions. On some occasions, this was manifested through an express promise to pay a balance in response to STOPS's statement of account. Other times, this was an implied promise to pay a balance in response to a statement of account by STOPS. For instance, on March 4, 2011, UME explicitly acknowledged that it then owed STOPS $114,000. On July 28, 2011, UME again explicitly acknowledged a balance of $112,000 and indicated that payment was forthcoming: "I'll work with payables to come up with a plan to get you folks paid off. I've

---

[4] Notably, Illinois law provides that an action for account stated is founded "not upon the original contract, but upon the promise to pay the balance ascertained." *Brad Foot Gear Works, Inc. v. Delta Brands, Inc.*, 332 F. Supp. 2d 1123, 1126 (N.D. Ill. 2004) (discussing Illinois law). Accordingly, UME's "lowest rate guarantee" defense also cannot defeat STOPS's claim for account stated.

been doing that one by one with all our vendors. We're not in the business of stiffing anyone."
On February 10, 2012, STOPS sent a letter to UME indicating that its then unpaid balance was
$169,193.20, and the outstanding balance continued to grow. Notably, UME never disputed this
total and continued to make partial payments to STOPS.

Even after STOPS indicated that it would no longer fill orders placed by UME, UME
continued to indicate that payment was forthcoming and failed to object to the amounts owed.
During the e-mail communications between STOPS representatives and UME representative
Shawn Landa ranging from March 4, 2011, to March 16, 2012, UME did not dispute the rates
charged by STOPS, any fees charged by STOPS (including wait time), or the amount owed to
STOPS by UME. Rather, the record (and UME's own admissions) reflects that UME repeatedly
promised payment to STOPS without indicating that any dispute existed. UME representatives
continued to place transportation orders with and continued to submit partial payments on the
balances owed to STOPS.

Applying Illinois law, the Seventh Circuit has held that a defendant's continued partial
payment of plaintiff's invoices, along with defendant's failure to object to the invoices in a
reasonable time, establishes an account stated. See *Delta Consulting Group, Inc. v. R. Randle
Const., Inc.*, 554 F.3d 1133, 1139 (7th Cir. 2009). In *Delta*, the plaintiff billed the defendant
$144,174.35 for services rendered over the course of several months. *Id.* at 1136. Throughout
the process, defendant had been receiving plaintiff's invoices and had paid approximately
$62,000 without objection. However, when the plaintiff sought payment on the unpaid invoices,
the defendant objected, indicating that it was not satisfied with plaintiff's work. The Seventh
Circuit affirmed summary judgment on the account stated claim, concluding that the parties
mutually assented to continuing services as defendant continued to pay invoices for plaintiff's

services. *Id.* at 1138 (citing *In re Marriage of Angiuli*, 134 Ill.App.3d 417, 480 N.E.2d 513, 518 (2nd Dist. 1985) ("assent to an account stated may be shown by payment or part payment of the balance")).

In addition to making partial payments, Defendant's requests for more time to pay the debt specifically established an account stated for the remaining, unpaid invoices. *Delta*, 554 F.3d at 1136. The Seventh Circuit found that "[i]t is unreasonable to believe that a transacting business would ask for more time to pay a debt it did not acknowledge it incurred." *Id.* The Seventh Circuit also highlighted the fact that the defendant retained the invoices beyond a reasonable time, without objection. *Id.*; see also *Brad Foote Gear Works, Inc. v. Delta Brands, Inc.*, 349 F. Supp. 2d 1073, 1075 (N.D. Ill. 2004) (noting that where the defendant fails to provide evidence that it objected to a plaintiff's statement of account within a reasonable time, summary judgment is appropriate).

The facts here are remarkably similar to the cases cited above. UME routinely paid invoices for several years, never objected to the invoices during the business relationship, continued to submit partial payments to STOPS, and sought more time to pay the balance owed. UME has not offered any evidence to the contrary. Instead, it raises two arguments in an attempt to stave off summary judgment.

First, UME contends that it should have the right to address, at trial, any error, mistake, or fraud in the account stated by STOPS. The critical problem with UME's argument, however, is that UME fails to identify any evidence whatsoever that even arguably establishes that there was an error, mistake, or fraud in the account stated. In other words, UME contends that it should have the right to proceed to trial to address an issue of fact even though UME has failed to identify what that issue of fact purportedly is. UME's argument fails, for "[s]ummary

judgment is the 'put up or shut up' moment in a lawsuit." *Siegel v. Shell Oil Co.,* 612 F.3d 932, 937 (7th Cir. 2010) (quoting *Johnson v. Cambridge Indus., Inc.,* 325 F.3d 892, 901 (7th Cir. 2003)). "Once a party has made a properly supported motion for summary judgment, the nonmoving party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting Federal Rule of Civil Procedure 56(e)). UME did not file its own statement of additional facts and has otherwise wholly failed to set forth specific facts showing that there is a genuine issue for trial.

Second, UME argues that the admissions in its e-mails are inadmissible under Federal Rule of Evidence 408. Under Rule 408(a), evidence of the following is not admissible either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:

> (1) furnishing, promising, or offering--or accepting, promising to accept, or offering to accept--a valuable consideration in compromising or attempting to compromise the claim; and
>
> (2) conduct or a statement made during compromise negotiations about the claim--except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

FED. R. EVID. 408(a). The law provides that, in order for Rule 408 to apply, a claim must actually be in dispute at the time of the negotiations, and the conduct or statement must relate to that claim. Effort to buy time in which to pay an obligation, even though the validity of the obligation is later disputed, is not an attempt to compromise a disputed claim and does not implicate Rule 408. See *In re B.D. International Discount Corp.*, 701 F.2d 1071, 1074 n.5 (2d Cir. 1983); *Deere & Co. v. International Harvester Co.*, 710 F.2d 1551, 1556–1557 (Fed. Cir. 1983); *Prudential Ins. Co. of Am. v. Curt Bullock Builders, Inc.*, 626 F. Supp. 159, 164-65 (N.D.

Ill. 1985). Rather, Rule 408 is limited to cases of "compromising or attempting to compromise a claim which was *disputed* as to either validity or amount." *In re B.D. International Discount Corp.*, 701 F.2d at n. 5 ("[a]t the time of negotiation B.D.I. did not dispute Chase's claim; it was simply endeavoring to get more time in which to pay") (emphasis added); *see also Deere & Co.*, 710 F.2d at 1556 ("we cannot identify a similar 'claim' over which the parties were in disagreement" at the time of the communication allegedly protected by Rule 408).

Here, the record clearly establishes that at the time that the e-mail exchanges occurred, there was no dispute as to the amount owed or the validity of the invoiced charges. In fact, as set forth repeatedly in STOPS's fact statements, UME never disputed any of STOPS's invoices, the amount that was owed, the rates charged by STOPS, or any fees charged by STOPS at any time prior to this lawsuit. UME's responses to STOPS's e-mails constituted an acknowledgement of the amount due, rather than a dispute as to the amount due or a compromise of the amount owed. See, *e.g.*, *Delta Consulting Group, Inc. v. R. Randle Const., Inc.*, 554 F.3d 1133, 1136 (7th Cir. 2009) (stating that"[i]t is unreasonable to believe that a transacting business would ask for more time to pay a debt it did not acknowledge it incurred."). For this reason, UME's statements are not protected by Rule 408.

An action for account stated exists in this case because UME acknowledged the correctness of the unpaid balance as it grew, UME promised payment of the unpaid balance, and UME continued to accept invoices from STOPS. Because the evidence of record demonstrates that there is no genuine issue as to any material fact, STOPS is entitled to summary judgment on the alternative ground of an account stated.

## C.      Counts III and IV

Because the Court concludes that STOPS is entitled to summary judgment on its claims

for breach of oral contract and account stated, the Court need not reach the alternative claims of *quantum meruit* and implied contract. Therefore, the Court denies as moot STOPS's motion for summary judgment as to Counts III and IV.

**D.     Pre-Judgment Interest**

STOPS claims that it is entitled to statutory interest on the amount of damages awarded in this case pursuant to the Illinois Interest Act ("IIA"), 815 ILCS 205/2. The IIA expressly provides that: "[c]reditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing. . . ." *Id.* Under Illinois law, statutory interest can be recovered at the discretion of the court. *Bank of Chi. v. Park Nat'l Bank*, 660 N.E.2d 19 (Ill. App. Ct. 1st Dist. 1995). The statute is applied on "instruments of writing," such as invoices. *ITQ Lata, LLC v. MB Fin. Bank, N.A.*, 317 F. Supp. 2d 844, 860 (N.D. Ill. 2004); *Sherwin–Williams Co. v. Mark Charcoal Co., Inc.,* 1985 WL 3932, at *6 (N.D. Ill. Nov. 15, 1985). The party seeking interest must prove that the money due was a liquidated amount or subject to easy computation. *Ameritech Info. Sys., Inc. v. Bar Code Res.,* 331 F.3d 571, 575 (7th Cir. 2003).

In *ITQ Lata*, the district court concluded that the plaintiff was entitled to statutory interest pursuant to the IIA on the amount of damages awarded on breach of contract and account stated claims. 317 F. Supp. 2d at 860. The court found that an award of interest was appropriate because the amount was easily computable, given that the damages were readily identifiable through invoices. The court awarded interest beginning 30 days after the last invoice was sent to the defendant. *Id.*

The IIA likewise authorizes this Court to award pre-judgment interest to STOPS. The amount owed by UME is easily computable, given that it is reflected in the invoices submitted

by STOPS. The Court will award statutory interest from April 16, 2012, which is 30 days after STOPS provided UME with notice of its efforts to collect the outstanding debt. Accordingly, as of the date on which the instant motion was filed, STOPS is entitled to $13,161.57 in pre-judgment interest, plus an additional $774.21 per month up until the date on which judgment is entered.

## IV. Conclusion

For the reasons set forth above, the Court grants in part STOPS Enterprises' motion for summary judgment [33] as to Counts I and II and denies as moot the motion with respect to Counts III and IV. The Court directs the Clerk to enter judgment in favor of Plaintiff STOPS Enterprises and against Defendant UME in the amount of $185,811.88. The Court also awards $13,161.57 in pre-judgment interest. STOPS's motion to conduct expedited discovery into Defendant's current financial condition [56] is stricken as moot now that judgment will be entered. In the event further inquiry is necessary, the parties may file an appropriate motion or call the Court's deputy to request a status hearing.


Dated: 6/13/14

Robert M. Dow, Jr.
United States District Judge